[Cite as *Strasburg v. Strasburg*, 2010-Ohio-3672.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

CINDRA K. STRASBURG,

    PLAINTIFF-APPELLEE,             CASE NO. 2-10-12

    v.

RONALD STRASBURG,             O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Auglaize County Common Pleas Court**
**Domestic Relations Division**
**Trial Court No. 2009 DR 0059**

**Judgment Affirmed**

**Date of Decision: August 9, 2010**

**APPEARANCES:**

    *James A. Roeder* for Appellant

    *William E. Huber* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Ronald Strasburg, appeals the judgment of the Court of Common Pleas of Auglaize County, Domestic Relations Division, granting Plaintiff-Appellee's, Cindra Strasburg, complaint for divorce. On appeal, Ronald argues that the trial court erred in finding that certain farmland was marital property; in failing to deduct ordinary and reasonable expenses from the gross receipts of his business income; and, in calculating his spousal support obligation despite Cindra's failure to provide her expenses. Based upon the following, we affirm the judgment of the trial court.

{¶2} In June 1970, Ronald and Cindra married. In April 2009, Cindra filed a complaint for divorce. All children born of the marriage had emancipated as of the filing.

{¶3} In October 2009, Ronald was deposed and stated that he was self-employed selling insurance and investments; that his accountant designed a setup for his business whereby income he generated through his self-employment was issued to him personally by an IRS 1099 form; that the 1099 form from his personal return was "crossed" to his Subchapter S Corporation, Legacy; that Legacy recognized the income and the operating expenses; that he was the sole shareholder, director, and decision maker of Legacy; that Legacy had not issued him a paycheck in two years because "business has been down"; that, accordingly,

he had not received a W-2 in 2007 or 2008; and, that Legacy currently had no assets and had a negative equity.

**{¶4}** Ronald continued that he, his brother Thomas, and his sister Carol, were each the beneficiaries of an undivided one-third interest in farmland from his father's estate; that all three beneficiaries executed a quitclaim deed transferring the farmland to Cindra in December 2005; that the farmland was solely in Cindra's name, with no conditions or restrictions of ownership; that, also in 2005, he and Cindra mortgaged the farmland and used the proceeds to pay off an outstanding farm credit loan balance from his father's estate; that the money he paid to his father's estate was the same amount he owed his father from a previous loan in 1983 when he started his business; that Cindra signed the $35,000 mortgage, but not the note; that she signed the mortgage because her name was on the deed for the farmland; and, that he rented the farmland to his brother and placed the proceeds into Legacy's account.

**{¶5}** In December 2009, the trial court held a final hearing, at which the following testimony was heard.

**{¶6}** Cindra testified that she was currently collecting unemployment of $122 per week after being laid off from the public library; that she was paying $144.99 per month for COBRA health care insurance; that she was paying for several charge cards with an aggregate balance of approximately $25,000,

groceries, and gasoline; that she was currently supporting herself, except that some of her friends were "feeding" her; that she was still residing in the marital residence, for which Ronald was paying virtually all of the expenses, but that she would be vacating in forty-five days; that she did not know where she would be moving until she received her divorce settlement because she had no money; that she owned approximately one hundred fifty Longaberger baskets; that she had sold some of the baskets for approximately $15 to $20, but that there was really no market for them; that she had worked for nearly the entire thirty-nine year marriage; that she had a high school degree and had attended two quarters of college, but did not complete a degree; that Ronald had a bachelor's degree; that the parties enjoyed a very good standard of living throughout the marriage; that Ronald had titled the farmland in her name; that the farmland came from his family; and, that, even though she held title to the farmland, Ronald managed it, and his brother and son-in-law farmed it.

{¶7} Ronald testified that, in 2004, his father died and he inherited one-third of his $939,844 estate; that, in 2005, he, his brother, and his sister deeded the farmland inherited from the estate via quitclaim to Cindra; that he put the farmland into Cindra's name because he was concerned about the risk that he would be sued; that he believed he and Cindra had a conversation concerning that risk and believed that she knew this was why the property was titled in her name; that he

did not believe he ever relinquished ownership, control, or dominion over the farmland; that he never intended to waive his rights to the property; that neither he nor Cindra had improved the farmland or exerted control over the farming; that the farmland was never entirely titled in his name, but was owned equally by him, his brother, and his sister as heirs to the estate; that he leased the farmland to his brother to grow crops in 2007, 2008, and 2009 for $11,532, $11,856, and $11,856, respectively; that the parties filed taxes jointly in 2007, 2008, and, 2009, so both paid taxes on the rental income; that, in 2007, Cindra earned $13,207 in income; and, that, after calculations, depreciation, and payments to banks, he incurred a loss of $2,329.

{¶8} Ronald further testified that his consulting business was called Strasburg Consulting; that Strasburg Consulting was organized as a sole proprietorship; that he earned his income from commissions paid to him by insurance companies for the policies he sold; that his gross income in operating Strasburg Consulting in 2003, 2004, 2005, 2006, and 2007, was, respectively, $161,568, $112,478, $77,168, $88,868, and $138,386; that his business expenses in operating Strasburg Consulting, consisting of paid commissions and fees, in 2003, 2004, 2005, 2006, and 2007, were, respectively, $161,568, $112,478, $77,168, $88,868, and $138,386; that, since approximately 1996, all of the money he earned through Strasburg Consulting was transferred to Legacy, the pass-

through operating entity Subchapter S corporation for which he was the sole shareholder; that his accountant organized his sole proprietorship and corporation in this manner for tax advantage purposes; that, in past years, he had paid himself a salary from Legacy, but had not taken a salary for three years because there was not enough money; that he paid his personal bills by taking money out of Legacy and listing them as loans from Legacy to the sole shareholder; that Legacy paid his office rent, payroll, insurance, taxes, utilities, advertising, and all the other costs of running a financial planning business; that Legacy had only one employee besides himself, a secretary whom Legacy paid $22,000 per year; and, that Legacy reimbursed him for mileage and other business-related expenses that he paid out-of-pocket. The individual tax returns submitted by both Ronald and Cindra reflected that the income or loss for Legacy in 2003, 2004, 2005, 2006, and 2007, was, respectively, $16,617, - $5,061, -$9,712, $6,796, and $31,866.[1]

{¶9} James Siefring, Ronald's CPA, testified that he prepared the Strasburgs' tax returns for 2003 through 2008; that Ronald operated his business through Legacy; that Ronald passed his income over to Legacy as its income; that this was the manner in which he recommended the Strasburgs handle their income

---

[1] Ronald's written closing argument submitted to the trial court claims that the tax forms establish Ronald's income in 2004, 2005, 2006, and 2007 was, respectively, $64,285, $11,760, $7,423, $13,207; however, Ronald and Cindra filed jointly, and Ronald testified at the hearing that the $13,207 represented Cindra's W-2 wages and that he had not received a W-2 in several years.

because it benefitted them financially and was permitted by the tax code; and, that Legacy's expenses were "legitimate." (Hearing Tr., p. 74).

{¶10} In January 2010, the parties submitted to the trial court written closing arguments. Cindra asserted that, regarding spousal support, this was a long-term marriage; that Ronald had a much higher earning ability and had been the primary source of income for the parties during the marriage; that she had recently undergone heart surgery, which affected her ability to obtain health insurance because it was a pre-existing condition; that the parties enjoyed a high standard of living throughout the marriage; that the average annual sum of commissions earned by Ronald from 2003 to 2007 was $115,693. Regarding the farmland, Cindra asserted that the property was never transferred to Ronald, but was purchased and granted to Cindra via quitclaim deed in December 2005; that a mortgage of $136,650 on the farmland was executed by both Ronald and Cindra; and, that the proceeds of the mortgage were used to pay off a marital debt—the loan extended to Ronald by his father to equalize the estate with his sister.

{¶11} Ronald asserted in closing that Cindra's request for spousal support should be denied, as she did not assert her request until the day of the hearing; that Cindra wrongfully characterized his income as his gross income without taking into consideration his business expenses; that Cindra's health conditions would not prevent her from performing office work; that the value of Cindra's basket

collection should be credited against any support obligation; and, that Cindra was likely receiving support from a boyfriend. Next, Ronald argued that Cindra was not entitled to the farmland as marital property because he inherited the property as a one-third undivided interest of his father's estate; that, because the property was an inheritance, it was his traceable separate property; that the farmland had not been comingled because he had no donative intent to gift the property to Cindra, but merely put it in her name to protect his assets in case he was sued; that there was no relinquishment of ownership, dominion, or control of the farmland; that the joint mortgaging of the farmland did not necessarily transmute the property into marital property pursuant to *Welsh-Pojman v. Pojman*, 3d Dist. No. 3-03-12, 2003-Ohio-6708; that the titling of the property in Cindra's name was not conclusive as to whether the property was marital or separate; and, that, as the property was his separate property, the $82,650 passive appreciation of the property was also his separate property pursuant to *Middendorf v. Middendorf* (1998), 82 Ohio St.3d 397.

{¶12} Thereafter, the trial court entered the Divorce Decree. The trial court found that Cindra was the owner of the 97.5 acre parcel of real estate in Auglaize County (the "farmland") via a quitclaim deed recorded on December 13, 2005; that the value of the property was $380,250; that Ronald had never owned the farmland; that the farmland was a one-third undivided interest in the estate of

Ronald's deceased father, which he never took ownership of, but conveyed via quitclaim deed to Cindra, giving her full ownership of the farmland; that Ronald then used marital assets in mortgaging the farmland to put money into his business and pay his siblings for the share of their deceased father's estate to which they were entitled; that, when Ronald transferred the one-third undivided interest in three parcels of real estate into full ownership in one parcel of real estate, the property was no longer identifiable as separate property and became marital property; that the parties treated the farmland as marital property as they both entered into a mortgage on the property and cash rent earned from the farmland was used as marital income; and, that, in making its finding that the farmland was marital property, the trial court considered R.C. 3105.171.

{¶13} Regarding Ronald's income, the trial court found that the average gross annual income deposited into Legacy was $115,693.60, and that the same amount was Ronald's potential gross income. The trial court reasoned that:

> **[Ronald] is self employed selling investments and insurance. * * * All sales made by [Ronald] result in a Federal Form 1099 being issued to him personally. He then turns this income over to a Subchapter S corporation known as Legacy Planning, inc. [Ronald] is the sole shareholder, sole officer and sole decision maker with regard to Legacy Planning, inc. Legacy Planning, inc. then had expenses by way of "Commissions and Fees" * * * that exactly match its income. [Ronald] testified that he takes "draws" from Legacy as needed but earns no income from Legacy. There was no testimony from any source as to what "Commissions and Fees" consist of. * * * It appears that both marital and business obligations were paid from the accounts of**

**Legacy, inc., although no specific bank account records were presented to the Court for review. \* \* \* [Ronald] was paying much, if not all of the expenses to service both business and family debt out of the income deposited by [Ronald] into the accounts of Legacy, inc. The average gross income of [Ronald] deposited into Legacy, inc. accounts as shown on [Cindra's] exhibits 9 – 13 is $115,693.60**

(Jan. 2010 Decree of Divorce, p. 3).

{¶14} Regarding spousal support, the trial court stated that it had considered all factors in R.C. 3105.18 including that Ronald was more educated than Cindra and had a much higher earning potential; that Cindra had recently undergone open-heart surgery leaving her with vocal difficulties; and, that the marriage was thirty nine and one-half years in duration. Consequently, the trial court concluded that Ronald should pay Cindra $3,200 per month for one hundred and eighteen months.

{¶15} It is from this judgment that Ronald appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY CONCLUDING THE INHERITED FARMLAND HAD BECOME UNIDENTIFIABLE AS THE SEPARATE PROPERTY OF THE DEFENDANT AND HAD BECOME MARITAL PROPERTY.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FAILING TO DEDUCT THE ORDINARY**

**AND REASONABLE EXPENSES FROM THE GROSS RECEIPTS OF THE DEFENDANT'S BUSINESS INCOME.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT CALCULATED DEFENDANT'S SPOUSAL SUPPORT OBLIGATION WHEN THE PLAINTIFF'S EXPENSES WERE NOT PROVIDED.**

{¶16} Due to the nature of Ronald's arguments, we elect to address his second and third assignments of error together.

*Assignment of Error No. I*

{¶17} In his first assignment of error, Ronald argues that the trial court erred and abused its discretion in concluding that the farmland was not his separate property, but had become marital property. Specifically, Ronald argues that he presented evidence from his father's estate's final accounting, a certificate of transfer, and the quitclaim deed to Cindra, sufficient to demonstrate that this property was traceable to his inheritance; that the state of the property never changed; that Cindra was listed on the mortgage of the farmland, but not the note; that the record is devoid of any indication that he made an inter-vivos gift of the farmland to Cindra; and, that, consequently, the farmland was his traceable, separate property.

{¶18} "In determining whether the trial court has appropriately categorized property as separate or marital, the standard of review is whether the classification

-11-

is against the manifest weight of the evidence." *Eggeman v. Eggeman*, 3d Dist. No. 2-04-06, 2004-Ohio-6050, ¶14, citing *Henderson v. Henderson*, 3d Dist. No. 10-01-17, 2002-Ohio-2720, ¶28. Accordingly, the trial court's judgment will not be reversed if the decision is supported by some competent, credible evidence. *Eggeman*, 2004-Ohio-6050, at ¶14, citing *DeWitt v. DeWitt*, 3d Dist. No. 9-02-42, 2003-Ohio-851, ¶10. In determining whether competent, credible evidence exists, "[a] reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the testimony." *Barkley v. Barkley* (1997), 119 Ohio App.3d 155, 159, citing *In re Jane Doe I* (1991), 57 Ohio St.3d 135.

**{¶19}** In a divorce proceeding, a trial court must classify property as either marital or separate and then award each spouse his or her separate assets. R.C. 3105.171(B),(D). Marital property includes "all real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i). R.C. 3105.171(A)(6)(a) describes separate property, stating, in pertinent part:

> **"Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:**
> * * *
> **(i)   An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;**

-12-

\* \*

**(vii) Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.**

{¶20} In addition, "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). Therefore, traceability is the main issue in determining whether separate property has become marital property due to commingling. *Earnest v. Earnest*, 151 Ohio App.3d 682, 2003-Ohio-704, ¶38, citing *Peck v. Peck* (1994), 96 Ohio App.3d 731, 734. Additionally, R.C. 3105.171(H) provides that "[e]xcept as otherwise provided in this section, the holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital property or separate property."[2] However, "title can be some evidence of the parties' intent as to the nature of the asset being marital or separate." *Gallo v. Gallo*, 11th Dist. No. 2000-L-208, 2002-Ohio-2815, ¶25. Finally, "the party seeking to establish an asset as separate property \* \* \* has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property." Id.

---

[2] This author wishes to emphasize that, despite R.C. 3105.171(H) and some courts' holdings, long-established case law holds that a formally executed deed in the correct form is presumed valid and may not be set aside except upon the challenger's demonstration of fraud, undue influence, or lack of capacity by clear and convincing evidence. See *Neville v. Neville*, 3d Dist. No. 9-08-37, 2009-Ohio-3817, ¶¶36-42 (Rogers, J., concurring in part and dissenting in part).

{¶21} In *Neighbarger v. Neighbarger*, 10th Dist. No. 05AP-651, 2006-Ohio-796, the Tenth Appellate District examined a situation where a husband transferred farmland via quitclaim deed to his wife shortly prior to their marriage. As the husband acquired the farmland prior to the marriage, it was his separate property that would normally not be subject to equitable distribution. The husband claimed that, upon the parties' divorce, the farmland was his traceable separate property because he had not intended to make a gift to the wife by transferring the property to her, but that his motive was to shield the farmland pending criminal charges and possible civil judgments against him. The Tenth District rejected the husband's argument, finding that, "[t]here is no question that [husband] intended, in 1990 [when he transferred the property to wife], to create a legal barrier between himself and the property. His stated objective was to shelter his assets from any financial risk arising from the criminal charges against him. If the outcome of the criminal trial had been different, he most certainly would have argued that he had no assets to satisfy whatever financial liability might have arisen * * * [.] Having made that choice for his own benefit in 1990, to the detriment of his children and creditors, we will not allow appellant to turn his deliberate action into a legal fiction for his own benefit again. He intended to transfer the property and, as evidenced by the quitclaim deed, he did transfer the property." *Neighbarger*, 2006-Ohio-796, at ¶25.

-14-

**{¶22}** Initially, we emphasize that, as Ronald is the party seeking to establish that the farmland is his separate property, he bears the burden of demonstrating its traceability by a preponderance of the evidence. See *Earnest*, supra. Ronald testified that, in 2004, during the marriage, he inherited farmland from his father's estate, and that he conveyed the property to Cindra via quitclaim deed because he was concerned about the risk that he would be sued. We find the situation sub judice to be analogous to *Neighbarger*, supra. Similar to *Neighbarger*, we note that Ronald transferred his inherited farmland via quitclaim deed immediately upon his inheritance, and that, had Ronald been sued, he doubtlessly would have argued that the farmland was Cindra's sole property, and was not an asset subject to any ensuing financial liability. Although the farmland at issue in *Neighbarger* was transferred to the wife *prior* to the marriage, and thus, was the wife's *separate* property upon divorce, we nevertheless find the reasoning to be persuasive. Here, the farmland was transferred to Cindra during the marriage via quitclaim deed, but the trial court found the property to be *marital* property. Regardless of Ronald's testimony that he did not intend to relinquish ownership or waive his rights to the property, the fact remains that Ronald deeded the farmland to Cindra solely via quitclaim deed, and did not retain any reserved rights or joint rights to the property. Thus, Ronald's testimony about his motives for the transfer was wholly inconsistent with his actions in making the transfer.

As Ronald's testimony established that he relinquished all legal rights to the farmland upon its transfer to Cindra, we cannot find that the trial court erred in concluding that the farmland was not Ronald's separate property.[3]

**{¶23}** Accordingly, we overrule Ronald's first assignment of error.

*Assignments of Error Nos. II and III*

**{¶24}** In his second assignment of error, Ronald argues that the trial court erred and abused its discretion in failing to deduct the ordinary and reasonable expenses from the gross receipts of his business income. Specifically, Ronald contends that the trial court calculated his spousal support obligation to Cindra based upon a potential income of $115,693.60, which he claims did not account for any of his ordinary and reasonable business expenses demonstrated by his tax returns, and that "one cannot dispute that a business does have expenses." In his third assignment of error, Ronald argues that the trial court erred and abused its discretion in calculating Cindra's spousal support obligation without any evidence of her expenses. We disagree with both of Ronald's arguments.

**{¶25}** We review a trial court's determination of spousal support under an abuse of discretion standard. *Siekfer v. Siekfer*, 3d Dist. No. 12-06-04, 2006-Ohio-5154, ¶15, citing *Heitzman v. Heitzman*, 3d Dist. No. 3-05-11, 2005-Ohio-4622, ¶3. An abuse of discretion "connotes more than an error of law or judgment; it

---

[3] We note that Cindra did not cross-appeal the issue of determination that the real estate was marital property, or argue that the real estate was her separate property.

implies that the court's attitude is unreasonable, arbitrary, or unconscionable."
*Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id.

{¶26} R.C. 3105.18 governs the trial court's award of spousal support and requires the court to consider fourteen factors set forth in R.C. 3105.18(C)(1) when determining whether spousal support is appropriate and reasonable, and when determining the nature, amount, terms of payment, and duration of the support. *Schalk v. Schalk*, 3d Dist. No. 13-07-13, 2008-Ohio-829, ¶28, citing *Lee v. Lee*, 3d Dist. No. 17-01-05, 2001-Ohio-2245. The factors are as follows:

> **(a)   The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;**
>
> **(b)   The relative earning abilities of the parties;**
>
> **(c)   The ages and the physical, mental, and emotional conditions of the parties;**
>
> **(d)   The retirement benefits of the parties;**
>
> **(e)   The duration of the marriage;**
>
> **(f)   The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;**
>
> **(g)   The standard of living of the parties established during the marriage;**

**(h)   The relative extent of education of the parties;**

**(i)   The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;**

**(j)   The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;**

**(k)   The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;**

**(l)   The tax consequences, for each party, of an award of spousal support;**

**(m)   The lost income production capacity of either party that resulted from that party's marital responsibilities;**

**(n)   Any other factor that the court expressly finds to be relevant and equitable.**

R.C. 3105.18(C)(1)(a)-(n).

**{¶27}** Although the trial court must consider all of these factors, it is not required to specifically enumerate all of the factors. *Hendricks v. Hendricks*, 3d Dist. No. 15-08-08, 2008-Ohio-6754, ¶31, citing *Schalk*, 2008-Ohio-829, at ¶28. However, the trial court must "make specific findings in order 'to enable a reviewing court to determine the reasonableness of its order to grant or deny a request for spousal support and that the relevant factors within R.C. 3105.18 were

considered.'" *Malloy v. Malloy*, 3d Dist. No. 8-08-15, 2009-Ohio-1918, ¶11, citing *Hendricks*, 2008-Ohio-6754, at ¶31.

{¶28} In determining the income of the parties, courts have particularly scrutinized situations where a spouse is the sole shareholder of his corporation, and, accordingly, has "unlimited control over the distribution of the corporation's profits and assets." *Burkart v. Burkart*, 10th Dist. No. 06AP-1169, 2007-Ohio-3992, ¶22, citing *Bowen v. Thomas* (1995), 102 Ohio App.3d 196, 201. Courts have found a need to "'pay particular attention to the possibility that a spouse who is the sole shareholder of a business is engaged in "creative accounting" designed to cloak net income.'" *Burkart*, 2007-Ohio-3992, at ¶22, quoting *Offenberg v. Offenberg*, 8th Dist No. 78885, 2003-Ohio-269, ¶30, quoting *Corrigan v. Corrigan*, 8th Dist. No. 74088, 1999 WL 304523.

{¶29} Here, Ronald presented testimony that his financial consulting business, Strasburg Consulting, was a sole proprietorship; that his entire income earned from Strasburg Consulting was transferred to Legacy, a pass-through operating entity Subchapter S corporation; that he had followed this procedure since approximately 1996 for tax advantage purposes; that he was the sole shareholder of Legacy; that he was the sole officer, director, and decision-maker of Legacy; that his gross income in operating Strasburg Consulting in 2003, 2004, 2005, 2006, and 2007, was, respectively, $161,568, $112,478, $77,168, $88,868,

and $138,386; that his business expenses in operating Strasburg Consulting, consisting of paid commissions and fees, in 2003, 2004, 2005, 2006, and 2007, were, respectively, $161,568, $112,478, $77,168, $88,868, and $138,386; that he paid his personal bills by taking money out of Legacy and listing the withdrawals as loans from Legacy to the sole shareholder; that Legacy reimbursed him for business-related expenses that he paid out-of-pocket; and, that Legacy's business expenses were "legitimate" expenses that included licenses and permits, dues and subscriptions, and staff meeting expenses.

{¶30} We cannot find, based on the evidence Ronald presented at the hearing, that the trial court abused its discretion in imputing an income to him calculated by averaging the gross income of Strasburg Consulting from 2003 through 2007. Although Ronald testified that his entire gross income from Strasburg Consulting was deducted as a "paid commissions and fees" expense when it was passed to Legacy, as reflected on his tax forms, neither he nor his accountant could testify as to what specific amount of business expenses either Strasburg Consulting or the pass through entity, Legacy, had incurred. Further, we do not disagree with Ronald's argument that a business doubtlessly has expenses; however, Ronald failed to present evidence to the trial court's satisfaction demonstrating the ordinary and reasonable expenses he incurred in operating his business. As such, we cannot find that the trial court abused its discretion in

declining to consider an unidentified amount of expenses when it calculated Ronald's income.

**{¶31}** Next, we turn to Ronald's argument that the trial court erred in ordering him to pay Cindra spousal support when she did not provide evidence of her expenses.

**{¶32}** Testimony was heard at the hearing that Cindra's sole source of income was unemployment of $122 per week; that she was paying $144.99 per month for health insurance; that she was paying on several charge cards with a balance of approximately $25,000; and, that she was paying for groceries and gasoline. Additionally, testimony was heard that, at the time of the hearing, Cindra was still living in the marital residence for which Ronald was paying the expenses, but that she was required to vacate within forty-five days; and, that Cindra did not know where she would be moving until she received her divorce settlement. Based upon the foregoing, we cannot find that the trial court had insufficient evidence of Cindra's expenses, assets, and liabilities to award her spousal support. The trial court had specific evidence about Cindra's income, health insurance costs, and credit card costs. Further, we cannot see how Cindra could have presented more specific evidence of her living costs in light of the fact that she was required to vacate the marital residence soon after the hearing, and did not yet know where she would be moving.

**{¶33}** Accordingly, we overrule Ronald's second and third assignments of error.

**{¶34}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW and PRESTON, J.J., concur.**

**/jlr**