[Cite as *Gilsdorf v. Gilsdorf*, 2014-Ohio-5000.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### MARION COUNTY

JO A. GILSDORF,

    PLAINTIFF-APPELLEE,               CASE NO.  9-13-34

    v.

JAMES H. GILSDORF,               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Family Court
Trial Court No. 12 DR 0224

Judgment Reversed and Cause Remanded

Date of Decision:   November 10, 2014

APPEARANCES:

    *David J. Gordon* for Appellant

    *J. C. Ratliff*  for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant, James H. Gilsdorf ("James"), brings this appeal from the judgment of the Common Pleas Court in Marion County, Family Division, granting a divorce from Plaintiff-Appellee, Jo A. Gilsdorf ("Jo"), finalizing property division, and awarding spousal support to Jo. On appeal, James contends that the trial court committed multiple errors when dividing the marital property, determining James's obligations with respect to spousal support, and ordering the parties to file a joint tax return for 2012. For the reasons that follow, the trial court's judgment is reversed.

*Facts and Procedural History*

{¶2} Jo and James married on January 15, 1977. They had five children, all of whom are emancipated. On July 23, 2012, Jo filed her complaint for divorce and James filed a counterclaim for divorce. The parties were unable to reach an agreement as to division of their property and the amount of spousal support owed to Jo; therefore, the matter proceeded to trial. The trial court held hearings on December 12, 2012, and March 5, 2013, during which the parties testified as to their earning capacities, income sources, assets, and liabilities. The parties also stipulated as to the values of some of their assets, including their real estate, life insurance policies, retirement funds, stock, some of their vehicles, and personal property. (*See* R. at 80.)

**{¶3}** In addition, after the parties had separated, but prior to obtaining the divorce, they divided certain assets between themselves, including silver and gold coins, which they had accumulated during their marriage. After obtaining her share of the silver and gold coins, Jo sold them in the spring of 2012. (Tr. at 276-278.) She also cashed in her IRA and purchased a house, paying for it with the IRA proceeds. (*See* Tr. at 242:1-17.) Although the coins, as consensually divided property, were not at issue during the divorce proceedings and they were not subject to the trial court's division of the property, the parties had raised the issue of tax consequences stemming from the sales. (*See, e.g.*, R. at 11, at 5; R. at 81, R. at 82; Tr. at 363.) On April 8, 2013, the trial court ordered the parties to file their 2012 income taxes jointly, even though James had already filed his 2012 taxes prior to the trial court's issuance of its order. (R. at 86.)

**{¶4}** On July 10, 2013, the trial court issued a decree of divorce with its findings of fact and division of property. The trial court found that Jo and James were married for thirty-six years, from the date of marriage on January 15, 1977, until the date of final hearing, March 5, 2013. (R. at 93 at 1-2.) Based on the hearings and stipulations submitted by the parties, the trial court found that James, who was sixty-nine years old at the time of the hearing, was an orthodontist, working part-time in his private practice and had a gross annual income of $100,685.92. (R. at 93 at 13-14.) In addition to the profits from the orthodontia

practice, the trial court considered James's income to include Social Security, military retirement pay, and rental income. (*Id.*)

**{¶5}** The trial court found that Jo, who was sixty-five years old at the time of the divorce, was a licensed registered nurse, who had not worked full time since February 1977, when she ceased working to raise children. (*Id.* at 11.) Since 2001, Jo had worked at several positions, including as a contingent staff nurse and an office nurse on an "as needed" basis. (*Id.* at 12.) She also assisted in some clerical work at her husband's business and volunteered at Studio 51, a.k.a. Channel 22. (*Id.*) Because of Jo's age, health issues, and employment history, the court did not apply full-time employment to her. (*Id.* at 13.) The trial court imputed yearly income to Jo at $31,660.00 per year, which included a finding that her earning capacity at part-time wages was $20,800.00 per year and that she was receiving Social Security income in the amount of $10,860.00 per year. (*Id.*)

**{¶6}** The trial court found that James's reasonable monthly living expenses were $3,800.00 and Jo's reasonable monthly living expenses were $3,500.00. (*Id.* at 14.) It also found that, based upon the duration of marriage and the age of the parties, it was appropriate to equalize their income and award spousal support to Jo. (*Id.*) Accordingly, the trial court ordered that James should pay Jo $2,500.00 a month "as and for spousal support." (*Id.* at 14.) The trial court further ordered that the spousal support should continue after James's death and "[t]o effectuate

said after death support," it ordered James to continue his ADA life insurance policy with Jo as the beneficiary. (*Id.* at 14-15, 17-18.)

{¶7} With respect to the parties' assets, the trial court found James's orthodontist practice to be a marital asset, valued at $97,000.00. (*Id.* at 4.) Likewise, the parties' real estate was considered a marital asset. (*Id.* at 6.) This included their marital residence located at 600 Vernon Heights Blvd. ("the Vernon Heights residence"), valued at $400,000.00; a property located at 325 Mount Vernon Ave., valued at $180,000.00; a property located at 220 Ellis Pl., valued at $12,000.00; and a house that Jo had purchased in anticipation of filing for divorce, at 333 Bradford St., valued at $80,000.00. (*Id.* at 6-7.) The trial court considered as marital property the parties' vehicles, the total value of which was $32,225.00; household goods valued at $13,875.00; retirement accounts valued at $220,546.00; life insurance in the value of $75,606.00; stock valued at $21,000.00; bank accounts and accounts receivables valued at $43,492.00; and an outstanding loan owed to James and secured by a promissory note in the amount of $30,000.00. (*Id.* at 4-10.)

{¶8} The parties' debt was $37,843.00. It included purchases by Jo in the amount of $7,598.00, expenses by James in the amount of $5,100.00, and the 2012 tax obligation in the amount of $25,145.00. (*Id.* at 8-10.) The total value of marital assets, minus the debts, amounted to $1,167,901.00.

{¶9} The trial court stated that it would "equalize the property division," and therefore, it found that each party should receive assets worth $583,950.50. (*Id.* at 10, 16-17.) The trial court then divided the parties' assets in the following way:

| Asset | James | Jo |
|---|---|---|
| Orthodontist practice | $97,000 | |
| 325 Mount Vernon Ave | $180,000 | |
| 220 Ellis Pl. | $12,000 | |
| 333 Bradford St. | | $80,000 |
| Vehicles | $18,552 | $13,673 |
| Cash value from all of the life insurance policies that are marital | | $75,606 |
| Retirement | $167,284 | $53,262 |
| Stock | | $21,000 |
| A/R | | $30,000 |
| Household goods | $3,500 | $10,375 |
| Bank accounts | $21,746[1] | $21,746 |
| **Total:** | **$500,082** | **$305,662** |

(*Id.* at 9-10, 15-16.) This resulted in James being awarded assets in the amount of $500,082.00, and Jo being awarded assets in the total value of $305,662.00. Nevertheless, even though the trial court did not award the Vernon Heights residence to either party, it inserted the $400,000.00 value of the residence on James's side of asset calculation, resulting in an assumption that James was awarded assets in the total value of $900,082.00. (*See id.* at 10.) Under this

---

[1] Although the trial court stated that "[t]he four marital accounts * * * shall be divided equally with each receiving $22,117.50" (R. at 93, J. Entry at 10), the final calculations chart states that each party would receive $21,746.00 from the bank accounts (*id.*). The parties do not allege an error on appeal related to this discrepancy.

assumption, the trial court attempted to "*equalize* the property division."
(Emphasis added.) (*Id.*)  The trial court thus ordered James to pay all of the marital
debt, which it calculated to be $37,843.00.  (*Id.*)  It further ordered that the Vernon
Heights residence be sold and that Jo be awarded the first $278,288.50 or
$283,083.50[2] from the proceeds of the sale, "after payment of realtor fees,
property taxes and closing costs."  (*Id.* at 10, 16-17.)  James was awarded "the
remainder" of the proceeds from the sale of the Vernon Heights residence.  (*Id.* at
17.)

{¶10} The trial court stayed its order pending this appeal, in which James
alleges the following six assignments of error, as follows.

> **I.    THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT INCLUDED THE APPRAISED VALUE OF THE MARITAL RESIDENCE AS AN ASSET OF APPELLANT IN THE DIVISON [sic] OF MARITAL ASSETS AND LIABILITIES.**

> **II.   THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DETERMINED THAT APPELLEE SHOULD BE AWARDED THE FIRST $278,288.00 OR $283,083.50[3] FROM THE NET PROCEEDS OF THE SALE OF 600 VERNON HEIGHT BLVD.**

> **III.  THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT MADE THE FINDING THAT THE**

---

[2] Although the trial court inserted a number of $278,288.50 in its asset calculations, as the amount to be awarded to Jo after the sale (R. at 93, J. Entry at 10), a different number appears in the "order" part of the trial court's decision, being $283,083.50 (*id.* at 17).  It appears that a typographical or a mathematical mistake occurred at some point in the trial court's distribution of marital assets.  We use $278,288.50 as the relevant number throughout this opinion.  Because we reverse the trial court's judgment with respect to the amount of money awarded to Jo, the discrepancy does not affect the outcome of the case.
[3] *See* comment in note 2, *supra*.

**2010 CHEVROLET IMPALA WAS A MARITAL ASSET AND NOT A FIXED ASSET OF APPELLANT'S BUSINESS CORPORATION. SUCH A FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

IV. **THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DETERMINED THE REASONABLE MONTHLY LIVING EXPENSES OF APPELLEE WAS [sic] $3,500.00 PER MONTH AND THAT THE REASONABLE MONTHLY LIVING EXPENSES OF APPELLANT WAS [sic] $3,800.00 PER MONTH; DETERMINED THE PARTIES' INCOME SHOULD BE EQUALIZED; ORDERED APPELLANT TO PAY SPOUSAL SUPPORT IN THE AMOUNT OF $2,500.00 PER MONTH WITHOUT CONSIDERING ALL THE FACTORS OF R.C. 3105.18(C).**

V. **THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND ABUSED ITS DISCRETION WHEN IT FAILED TO INCLUDE THE DEATH OF APPELLANT AS A FACTOR FOR APPELLANT'S SPOUSAL SUPPORT TO TERMINATE; FURTHER ORDERED THAT HIS SPOUSAL SUPPORT OBLIGATION WOULD CONTINUE AFTER HIS DEATH AND ALSO ORDERED APPELLANT TO MAINTAIN HIS LIFE INSURANCE POLICY WITH APPELLEE AS BENEFICIARY.**

VI. **THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT ORDERED THAT THE PARTIES FILE A JOINT TAX RETURN FOR 2012.**

{¶11} Assignments of error I, II, III, and VI concern the division of the marital property. In a divorce action, the trial court has broad discretion in the allocation of marital assets. *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 5; *Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 26. When dividing marital property, "a trial court must

generally assign and consider the values of marital assets in order to equitably divide those assets." *Schwarck*, 2012-Ohio-3902, at ¶ 26.

> In any divorce action, the starting point for a trial court's analysis is an equal division of marital assets. However, R.C. 3105.171(C) clearly provides that where an equal division would be inequitable, a trial court may not divide the marital property equally but instead must divide it in the manner that the court determines to be equitable.

*Neville*, 2003-Ohio-3624, at ¶ 5, citing R.C. 3105.171(C), *and Cherry v. Cherry*, 66 Ohio St.2d 348, 355, 421 N.E.2d 1293 (1981); *accord Schwarck*, 2012-Ohio-3902, at ¶ 26. Because the standard of review for an appellate court is an abuse of discretion, we will not reverse the trial court's distribution of marital assets unless "its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound." *Schwarck*, 2012-Ohio-3902, at ¶ 16; *see also Neville*, 2003-Ohio-3624, at ¶ 5.

### 1. First and Second Assignments of Error— the Vernon Heights Residence

**{¶12}** We address the first two assignments of error together. The issues presented here concern the Vernon Heights residence and the trial court's act of inserting the $400,000.00 value of the residence on James's side of the asset calculation, resulting in an erroneous assumption that James was awarded assets in the total value of $900,082.00. As James properly points out in his brief, the trial court did not award the Vernon Heights residence, or its value, to either party.

(App't Br. at 5.) It ordered that the Vernon Heights residence be sold. Because the trial court did not award the Vernon Heights residence to James, it was an error to consider the value of the residence in the calculation as James's asset.

{¶13} Because the asset calculation was in error, the trial court's further decision that equalization of the property division required that Jo be awarded the first $278,288.50 from the proceeds of the sale, was also in error, as based on that improper calculation. Under the distribution actually ordered by the trial court, James's assets were $500,082.00, and Jo's assets were $305,662.00. After the court-ordered payment of the $37,843.00 for the marital debt, James's assets would have the value of $462,239.00. In order to achieve an equal distribution of the assets based on the trial court's current distribution of the property, Jo would have to be awarded $78,288.50. The trial court's order, however, requires payment of $278,280.50 from the proceeds of the sale of the Vernon Heights residence to Jo, "after payment of realtor fees, property taxes and closing costs," with the remainder awarded to James. (R. at 93, at 10, 16-17.)

{¶14} Jo suggests that the trial court's error was harmless. (App'ee Br. at 10, citing R.C. 3105.171(E)(2).) We disagree. The parties stipulated as to valuation of the property, but no stipulation or any finding has been made as to the price for which the property would sell. In order to result in an equal distribution of assets, the trial court's decision that the Vernon Heights residence is not

awarded to either party, but is ordered to be sold, with $278,288.50 of the net proceeds awarded to Jo, and remainder to James, would have to assume that the sale, after payment of realtor fees, property taxes, and closing costs, will yield the net proceeds of $400,000.00. Such an assumption is purely speculative and unsupported by any evidence provided to the trial court. Had the trial court actually awarded the Vernon Heights residence to James, without an order to sell it, James would retain the $400,000.00 asset. Under such circumstances, inserting the $400,000.00 asset on James's side of asset calculations and an order to pay Jo the $278,288.50, to achieve equalization of the assets, would have been proper. *See, e.g.*, *Derrit v. Derrit*, 163 Ohio App.3d 52, 2005-Ohio-4777, 836 N.E.2d 39, ¶ 52 (11th Dist.). In the current state of things, however, the ordered distribution of the assets is not equal and the error was not harmless.

{¶15} We acknowledge that an equal property division is not required where the trial court finds that such a division is improper. The Revised Code states that if an equal division of property is inequitable, " 'the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable.' " *Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, at ¶ 14, quoting R.C. 3105.171(C)(1). Nevertheless, the trial court in this case did not determine that an equal division of property would be inequitable. Instead, it stated that it was "equaliz[ing] the property

division" when it ordered that Jo "be awarded the first $278,288.50 from the sale of the Vernon Heights residence." (R. at 93, J. Entry at 10.) The result, however, is not equal, as our explanation above indicates.

{¶16} The trial court's order crediting James with an asset worth $400,000.00 without awarding that asset to him, and further ordering an equal division of assets but dividing the assets in an unequal manner is contrary to the evidence and contrary to the trial court's stated intentions. As such, it is an abuse of discretion. We thus reverse the trial court's judgment and remand the case for a proper disposition of the Vernon Heights residence and for a new calculation as to the amount owed to Jo that is based on that disposition.[4] The first and second assignments of error are sustained.

### 2. Third Assignment of Error—2010 Chevrolet Impala

{¶17} The trial court found that James "drives a 2010 Chevrolet Impala *which is owned by his orthodontic practice*," valued at $12,652.00. (Emphasis added.) (R. at 93, J. Entry at 7.) At the same time, the trial court "did not see where the vehicle was accounted for as an asset of the business, although an auto expense is listed on Defendant's Exhibit 'B-2' as a business expense." (*Id.*) Upon this finding, the trial court attributed the 2010 Chevrolet Impala to James

---

[4] We further note that the discrepancy discussed in note 2, *supra*, requires clarification by the trial court. Nevertheless, due to our disposition of this assignment of error and our holding that the trial court must perform a new calculation as to the amount owed to Jo, the discrepancy becomes immaterial.

personally in its asset calculation chart, and credited him with its value of $12,652.00. (*Id.* at 7, 10.)

{¶18} In response to the trial court's failure to "see where the vehicle was accounted for as an asset of the business," James points to page 27 of the Business Valuation Report. (R. at 109, Ex. N.) There, the 2010 Chevrolet Impala is included as a fixed asset in the "Goodwill Analysis" of the business, albeit at a different price $11,100.00. (*Id.*) James submits that the valuation of his orthodontic practice already includes the price of the 2010 Chevrolet Impala and therefore, James was credited with the vehicle's value twice, in the business valuation, at $11,100.00, and in his assets valuation, at $12,652.00. Thus, he argues that the resulting property division was against the manifest weight of the evidence and was an abuse of discretion.

{¶19} In response, Jo submits facts showing that the car is used as James's personal vehicle rather than a business vehicle and that the vehicle was purchased with a $33,800.00 loan that is payable to James. She argues that, irrespective of whether the car was counted twice, James benefits from the trial court's property division because the account receivable for the loan "was never attributed to his asset column." (App'ee Br. at 13.)

{¶20} Because Jo has not appealed the trial court's decision, we do not determine whether James improperly benefits from the trial court's division of the

marital assets and its alleged failure to credit him with an account receivable for the car loan. With regards to James's claimed assignment of error, we hold that the trial court erred in attributing the value of the vehicle twice in James's asset column, while specifically finding that the vehicle is owned by the orthodontic practice. We sustain the third assignment of error and remand this part of the trial court's decision for a correction of the asset calculations, with the value of the 2010 Chevrolet Impala attributed as an asset only once.

### 3. Sixth Assignment of Error—Tax Return for 2012

{¶21} In his sixth assignment of error, James disputes the trial court's order that the parties should file a joint tax return for 2012. Among the reasons for contesting this decision, James alleges that "the parties agreed that they would file separate tax returns for 2012"; neither party had requested that a joint return be filed; Jo had not provided the court with all relevant information to determine her tax liability; and the court's calculations of the 2012 tax liability did not include consequences of Jo's sale of gold and silver coins, which were her separate consensually divided property. (App't Br. at 19-21.)

{¶22} James alleges that before the hearings on their divorce, the parties agreed to file separate tax returns. No written stipulation was filed of any such agreement, however. Nevertheless, the record discloses that during the hearing on December 12, 2012, Jo's counsel questioned James as follows:

> Q: It's our proposal that the parties file separate returns for 2012, you don't have a problem with that?
> A: That's fine.
> Q: And for what cash-in stuff she did, whether the gold and silver will be taxable, and I know where she cashed in her IRA will be taxable, she'll pay that, you don't have any problem with that?
> A: That's fine.
> Q: And if you cash anything in, the tax of what you owe on that, that would be taxable to you, you don't have any problem with that, do you?
> A: That's fine.

(Tr. at 91:3-17.) Following that hearing, James filed a separate tax return on February 7, 2013, utilizing the status "married filing single." (R. at 109 Ex. FF.)

{¶23} At the hearing on March 5, 2013, James testified that he had already filed his individual 2012 taxes. (Tr. at 427:25-428:1.) It appears that Jo's counsel did not remember about the December discussion and its "proposal" that the parties file separate tax returns for 2012, because he questioned James:

> Q: So you're saying that you were supposed to file separately?
> A: Yes, that was decided on December 12th at the end of the hearing and I was privy to that and I believe it was recorded, so if you pull the record, I think you'll find out.
> Q: I did. I can't find it.
> A: Is that right? I see, well, you met in chambers before that, with the Judge before that proceeding started, and I thought you agreed to it at that time also.

(Tr. at 453:3-13.) At the end of that hearing, Jo's counsel stated that he could not find any agreement regarding separate filing of the 2012 taxes. (Tr. at 480.) He stated, "I just wondered if that was said and I'm not saying it wasn't said." (Tr. at 480:10-11.)

- 15 -

**{¶24}** Following that hearing, on March 15, 2013, James filed a "Memorandum on the Issue of 2012 Income Taxes (Married Filing Separately)." (R. at 81.) In it, James advised the court about the exchange that occurred at the December hearing, which is quoted above. (*Id.*, quoting Tr. at 91:3-17.) Jo responded to James's Memorandum and explained that the proposal made at the December hearing was conditional and, due to certain actions by James, she was now requesting the court to order filing of tax returns that would be "most advantageous to both parties." (R. at 82.)

**{¶25}** On April 8, 2013, the trial court issued a judgment entry, which read, in its entirety:

> This matter comes to the attention of the Court pursuant to the Memorandum on Issue of 2012 Income Taxes filed March 15, 2013, and Memorandum Contra filed March 25, 2013.
>
> The Court finds that the parties shall file a joint 2012 tax return. Any refund shall be deposited in the trust account of Attorney David Gordon for distribution at a later date.
>
> It is so ORDERED.

(R. at 86.)

**{¶26}** On April 15, 2013, James filed a "motion to reconsider," requesting the trial court to take into consideration the tax consequences of Jo's actions,

including the sale of gold and silver "for over $66,000.00."[5] (R. at 87.) James contended that because no evidence had been presented as to the potential tax liability on the gold and silver sale, the trial court's decision failed to fully consider all the tax implications of the joint filing. (*Id.*) Further, due to the fact that silver and gold coins were Jo's separate consensually divided property at the time of the sale, James objected to being personally liable for the tax obligations stemming from the sale. (*Id.*)

{¶27} On May 15, 2013, James filed another motion, requesting the trial court to order Jo to pay any additional tax, which became due "because the parties were ordered to file a joint 2013 income tax return by this court." (R. at 88.) James attached "[c]opies of the 2013 [sic] amended tax returns for the parties," which were not signed by the parties. (*Id.*) According to James's memorandum, the following amounts were still due on the 2012 tax returns: $16,057.00 due to the U.S. Treasury; $3,620.00 due to the state of Ohio; and $480.00 due to the city of Marion. (*Id.*) These numbers totaled in $20,157.00. Jo responded, arguing that the additional tax liabilities resulted from her cashing her IRA, which was necessary because James refused to "co-sign on a mortgage with her to secure financing" for her new home. (R. at 89.)

---

[5] In the trial court, the parties also discussed the tax consequences of cashing Jo's IRA. James does not allege an error with respect to this issue on appeal and it appears that it has been resolved by the trial court's judgment entry granting divorce. (*See* App't Br. at 21.)

{¶28} In its judgment entry granting the divorce, on July 10, 2013, the court stated:

> With regard to the filing of the income taxes for 2012 the Court ordered the parties to file jointly. The Court finds that the tax obligation is a marital debt and that it is fair and equitable that the parties file their taxes jointly. On May 15, 2013, counsel for husband filed a motion asking the Court to require wife to pay the additional taxes owed due to her distribution of her IRA. The court finds based on the findings above that this issue is moot.

(R. at 93, at 9.) The trial court then found that the parties' debt for the 2012 taxes amounts to $25,145.00. (*Id.* at 10.) The trial court included this number in the calculation of the parties' marital debt, and accounted for it when distributing the parties' assets. (*Id.*) The trial court did not address the issue of whether a portion of this "marital debt" was actually separate debt attributable to Jo as a result of tax liability resulting from her sale of her share of the parties' consensually divided gold and silver coins.

{¶29} We cannot determine what is encompassed in the number assigned by the trial court as the parties' debt stemming from their 2012 tax obligation. According to James's May 15, 2013 filing, the taxes that were still due amounted to $20,157.00, while the number in the trial court's judgment entry was $25,145.00.[6] This judgment entry did not address tax consequences of the sale of

---

[6] Multiple pages of state and federal tax returns were attached to James's May 15, 2013 filing. We are unable to determine which of the documents have actually been filed. The numbers included on those statements are inconsistent and they do not amount to $25,145.00, which is the number calculated by the trial court.

- 18 -

Jo's silver and gold coins, and did not mention the parties' filings discussing that issue.[7] Therefore, we are unable to determine whether the trial court considered the tax consequences of the sale of Jo's silver and gold coins. Furthermore, neither the April 8, 2013 ruling nor the July 10, 2013 entry of divorce, indicate whether the trial court considered the fact that, in reliance on the statements made on the December 12, 2012 hearing, James had already filed his 2012 tax return separately and paid his amounts owed under that separate tax return. (*See* Tr. at 452:6-453:21; R. at 88.)

{¶30} As stated above, when dividing marital property, "a trial court must generally assign and consider the values of marital assets in order to equitably divide those assets." *Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, at ¶ 26. We remand the issue to the trial court because, due to the discrepancies and deficiencies in the judgment entries, we are unable to determine whether the trial court properly assigned and considered the value of the marital, and any separate, tax obligations. Consequently, we are unable to determine whether the order that the parties shall file a joint tax return for 2012 was reasonable.

{¶31} The sixth assignment of error is sustained.

---

[7] In the final paragraphs of the judgment entry, the trial court ordered "that all other pending motions not addressed herein are dismissed." (R. at 93, at 18.)

### 4. Fourth and Fifth Assignments of Error—Spousal Support

{¶32} James challenges the trial court's order with regard to the spousal support on several grounds, including the calculation of the parties' annual income, their monthly expenses, and the amount and duration of the spousal support. When reviewing these challenges, we are required to defer to the trial court's judgment because a trial court has broad discretion on issues concerning awards of spousal support and its order will not be reversed absent an abuse of that discretion. *Siekfer v. Siekfer,* 3d Dist. Putnam No. 12-06-04, 2006-Ohio-5154, ¶ 15; *see also Kunkle v. Kunkle,* 51 Ohio St.3d 64, 67, 554 N.E.2d 83 (1990). A trial court will not be found to have abused its discretion unless its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *Muckensturm v. Muckensturm*, 3d Dist. Hancock No. 5-11-38, 2012-Ohio-3062, ¶ 16; *Bruce v. Bruce,* 3d Dist. Marion No. 9-10-57, 2012-Ohio-45, ¶ 13.

{¶33} The award of spousal support is not based solely on the "need" of the party, but on what is "appropriate and reasonable" under many factors, which are listed in R.C. 3105.18(C)(1). *Muckensturm*, 2012-Ohio-3062, at ¶ 20. R.C. 3105.18, which governs the trial court's award of spousal support, requires the court to consider all fourteen of the factors listed there when determining whether spousal support is "appropriate and reasonable," and when determining the nature, amount, terms of payment, *and duration* of the support. *Strasburg v. Strasburg,*

3d Dist. Auglaize No. 2-10-12, 2010-Ohio-3672, ¶ 26. Among the factors listed by R.C. 3105.18(C)(1) are:

> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> * * *
>
> (d) The retirement benefits of the parties;
>
> * * *
>
> (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
>
> * * *
>
> (n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1); *Muckensturm*, 2012-Ohio-3062,¶ 17.

{¶34} The trial court is not required to specifically enumerate the factors of R.C. 3105.18(C)(1) in its analysis, but it must indicate the basis for the award to allow for adequate appellate review. *Parker v. Parker*, 182 Ohio App.3d 49, 2009-Ohio-1917, 911 N.E.2d 364, ¶ 4 (3d Dist.), citing *Hendricks v. Hendricks,* 3d Dist. Van Wert No. 15-08-08, 2008-Ohio-6754, ¶ 31, *and Hawley v. Hawley*, 11th Dist. Portage No. 2003-P-0096, 2004-Ohio-3189, ¶ 15. Thus, the trial court must make specific findings in order "to enable a reviewing court to determine the reasonableness of its order * * * and that the relevant factors within R.C. 3105.18

were considered." *Lee v. Lee*, 3d Dist. Shelby No. 17-01-05, 2001 WL 934430, *2, citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 97, 518 N.E.2d 1197 (1988). In the current case, James alleges that the trial court overlooked several important issues when determining how to achieve the equalization of the parties' income, which resulted in Jo's monthly income under the order exceeding James's monthly income.

**{¶35}** First, James contends that the trial court failed to fully consider the first factor mandated by R.C. 3105.18(C)(1), "because it did not consider the additional monthly income [Jo] will receive from [James's] military pension, and the resulting reduction of [James's] income." (App't Br. at 12.) In determining the income of the parties, the trial court made the following statements:

> The Court further finds that wife has the earning capacity at part time wages for an RN of $20,800.00 per year as a part time office nurse. Wife's income therefore coupled with her Social Security of $10,860.00 per year will be imputed to $31,660.00 per year. * * *
>
> * * The court finds that husband's average income during [2007-2011] was $49,159.35. In addition husband has monthly Social Security income of $2,304.00 per month, military retirement pay of $1,324.58 per month and $650.00 per month rental income. Together with his income from his business husband has gross annual income of $100,685.92.

(R. at 93, J. Entry at 13-14.)

**{¶36}** We note that adding the numbers listed by the trial court in considering the husband's income results in $100,502.31, rather than $100,685.92

achieved by the trial court. This discrepancy, alone, is sufficient to reverse the trial court's judgment. As an additional concern, the trial court's judgment does not indicate whether the number of $1,324.58 per month reflects James's monthly military pension prior to or after dividing the marital portion of the retirement. Conversely, Defendant's Exhibit O, prepared on November 7, 2012, as well as James's testimony on March 5, 2013, suggest a possibility that the number was calculated without consideration of the reduction stemming from the trial court's decision. (R. at 109, Ex. O; Tr. at 413:6-22.)

{¶37} Second, James contends that the trial court's finding regarding the parties' monthly living expenses was based on outdated data and is therefore inaccurate. In determining the parties' monthly living expenses, the trial court stated that it "examined the parties' statements regarding their monthly expenses." (R. at 93, J. Entry at 14.) The court then found that James had "reasonable monthly living expenses of $3,800.00 per month" and Jo had "reasonable monthly living expenses of $3,500.00 per month." (*Id.*) Although we do not determine that the trial court's finding regarding monthly living expenses of each of the parties was based on inaccurate data, we reverse the trial court's award of spousal support.

{¶38} Due to the deficiencies and discrepancies in the trial court's judgment, which we have pointed out throughout this opinion, we are unable to

determine the reasonableness of the trial court's finding with respect to the parties' annual income and the amount of spousal support. Thus, we cannot affirm the trial court's decision in this respect. Furthermore, due to our holdings above, the trial court will be required to redo the asset division, which may affect the parties' annual income and expenses, and as a result, it may change the calculation with respect to spousal support. (*See* R.C. 3105.18(C)(1) (requiring the trial court to consider income, assets, and liabilities of the parties "in determining the nature, amount, and terms of payment, and duration of spousal support").)

{¶39} For the foregoing reasons, the fourth assignment of error is sustained.

{¶40} Additionally, because our opinion requires the trial court to reconsider its decision with respect to spousal support, which includes its duration, the fifth assignment of error is moot. We note, however, that the peculiar language employed by the trial court in the judgment entry referencing "after death support" should be sufficiently clarified as to what the trial court was attempting to achieve: spousal support of indefinite duration in which case the guidelines outlined by the Ohio Supreme Court in *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 69, 554 N.E.2d 83 (1990) should be satisfied, or spousal support of definite duration that is secured by a life insurance policy if James dies before the spousal support is terminated, *see e.g., Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 2, fn.2; *Waller v. Waller*, 7th Dist. Jefferson No. 04 JE

27, 2005-Ohio-5632, ¶ 11, 13, or a different mechanism of effectuating a payment to Jo upon James's death.

*Conclusion*

**{¶41}** Having reviewed the arguments, the briefs, and the record in this case, we find error prejudicial to Appellant in the particulars assigned and argued. The judgment of the Common Pleas Court in Marion County, Ohio is therefore reversed and remanded for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**SHAW and PRESTON, J.J., concur.**

**/jlr**