[Cite as *Ward v. Ward*, 2020-Ohio-3415.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

JOSEPH J. WARD,

    PLAINTIFF-APPELLEE,                  CASE NO. 9-19-24

    v.

SHANNON L. WARD,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 2017 DR 0198

Judgment Affirmed

Date of Decision:    June 22, 2020

APPEARANCES:

    *Rocky Ratliff* for Appellant

**PRESTON, J.**

{¶1} Defendant-appellant, Shannon L. Ward ("Shannon"), appeals the March 27, 2019 judgment of the Marion County Court of Common Pleas, Family Division. For the reasons that follow, we affirm.

{¶2} Shannon and plaintiff-appellee, Joseph J. Ward ("Joseph"), were married on March 4, 2000. (Doc. Nos. 1, 11, 92). Two minor children were born as issue of the marriage. (*Id.*). On September 1, 2017, Joseph filed a complaint in the trial court requesting a divorce from Shannon. (Doc. No. 1). On September 25, 2017, Shannon filed her answer to Joseph's complaint and a counterclaim for divorce. (Doc. No. 11).

{¶3} The final hearing in the matter commenced on March 14-15, 2019. (Doc. No. 92). On March 27, 2019, the trial court filed its judgment entry granting Joseph's complaint for divorce. (*Id.*). In the judgment entry, the trial court also divided the parties' property. (*Id.*). Relevant to this appeal, the trial court determined that all of the property acquired by the parties during the marriage, with the exception of the shares of stock in Ohigro, Inc. ("Ohigro") held by Joseph, is marital property subject to equitable division by the court. (*Id.*). The trial court determined that Joseph's 3,267 shares of Class B non-voting stock in Ohigro were "obtained pursuant to a defined pattern of gifting to transfer ownership of a 'closely-

held' family business to family members only," and were thus separate property that was not subject to equitable division. (*Id.*).

{¶4} Additionally, the trial court ordered that Shannon retain the 2016 Honda Odyssey van titled in Joseph's name and assume responsibility for paying the loan on the van. (*Id.*). Further, the trial court ordered that Joseph be held harmless from payment on the van. (*Id.*).

{¶5} On April 26, 2019, Shannon filed her notice of appeal. (Doc. No. 95). She raises three assignments of error, which we address together.

**Assignment of Error No. I**

**The trial court erred by ruling that the 3,267 shares of Class B non-voting shares of stock received from Ohigro by Plaintiff-Appellee were non-marital and as such, were not subject to division by the Court, as the shares were actually marital in nature.**

**Assignment of Error No. II**

**Even if the Court was correct in classifying this property as a gift and separate property, the stock was converted to marital property status due to increase in value during the marriage, and the Appellant should have been awarded one-half (1/2) of any appreciation of the improved value as the improved value would be marital in nature.**

**Assignment of Error No. III**

**The trial court's award of the 2016 Honda Odyssey Van to Appellant resulted in an inequitable division of this asset and/or debt, as Appellant did not have the means to make the payment on the loan associated with said vehicle and Appellant had five (5) times the amount of income as Appellant.**

{¶6} In her first assignment of error, Shannon argues that the trial court erred by determining that Joseph's shares of stock in Ohigro were separate property and, therefore, not subject to division. Specifically, Shannon argues that a portion of Joseph's stock in Ohigro was marital property because it was acquired during the marriage and was received, in part, due to his employment at Ohigro. In her second assignment of error, Shannon argues that even if the trial court did not err by classifying Joseph's shares of stock in Ohigro as separate property, the trial court subsequently erred by not awarding her one-half of any appreciation of the improved value of the stock. Specifically, Shannon contends that the value of the stock improved due to the work Joseph performed as an employee of Ohigro, and thus, the trial court should have equitably divided the appreciation of the improved value of the shares of stock between the parties. In her third assignment of error, Shannon contends that the trial court's award of the 2016 Honda Odyssey to her resulted in an inequitable division of marital property because she does not have the means to make payments on the vehicle and her income is substantially lower than Joseph's income.

{¶7} "In divorce proceedings, the trial court must determine which property is marital and then divide that property in an equitable manner." *Dabis v. Dabis*, 3d Dist. Mercer No. 10-97-17, 1998 WL 391938, *2 (July 9, 1998); R.C. 3105.171. Marital property does not include separate property. R.C. 3105.171(A)(3)(b).

Following the classification of assets as marital or separate property, the separate property is generally awarded to the party that owns that property regardless of whether the separate property was acquired before or during the marriage. R.C. 3105.171(D).

**{¶8}** "The trial court's classification of property as marital or separate is a factual determination." *Worden v. Worden*, 3d Dist. Marion No. 9-16-54, 2017-Ohio-8019, ¶ 17, citing *Rinehart v. Rinehart*, 4th Dist. Gallia No. 96 CA 10, 1998 WL 282622 (May 18, 1998). "An appellate court reviews the trial court's classification of property as marital or separate property under a manifest weight of the evidence standard." *Mousa v. Saad*, 3d Dist. Marion No. 9-16-43, 2017-Ohio-7116, ¶ 24, citing *Brandon v. Brandon*, 3d Dist. Mercer No. 10-08-13, 2009-Ohio-3818, ¶ 11, citing *Gibson v. Gibson*, 3d Dist. Marion No. 9-07-06, 2007-Ohio-6965, ¶ 26, quoting *Eggeman v. Eggeman*, 3d Dist. Auglaize No. 2-04-06, 2004-Ohio-6050, ¶ 14. "An appellate court will not reweigh the evidence introduced at trial; rather, we will uphold the findings of the trial court if the record contains some competent, credible evidence to support the trial court's conclusions." *Eggeman* at ¶ 27. "In determining whether competent, credible evidence exists, '[a] reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the

credibility of the testimony.'" *Bey v. Bey*, 3d Dist. Mercer No. 10-08-12, 2009-Ohio-300, ¶ 15, quoting *Barkley v. Barkley*, 119 Ohio App.3d 155, 159 (4th Dist.1997).

{¶9} R.C. 3105.171(A)(3)(a) defines marital property as follows:

(i)  All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(ii)  All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage;

(iv) A participant account, as defined in section 148.01 of the Revised Code, of either of the spouses, to the extent of the following: the moneys that have been deferred by a continuing member or participating employee, as defined in that section, and that have been

transmitted to the Ohio public employees deferred compensation board during the marriage and any income that is derived from the investment of those moneys during the marriage; the moneys that have been deferred by an officer or employee of a municipal corporation and that have been transmitted to the governing board, administrator, depository, or trustee of the deferred compensation program of the municipal corporation during the marriage and any income that is derived from the investment of those moneys during the marriage; or the moneys that have been deferred by an officer or employee of a government unit, as defined in section 148.06 of the Revised Code, and that have been transmitted to the governing board, as defined in that section, during the marriage and any income that is derived from the investment of those moneys during the marriage.

Furthermore, R.C. 3105.171(A)(3)(b) indicates that marital property "does not include separate property." R.C. 3105.171(A)(6)(a) defines separate property, in relevant part, as any interest in real or personal property that the court finds to be any of the following:

(i) An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;

(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage;

(iv) Any real or personal property or interest in real or personal property acquired by one spouse after a decree of legal separation issued under section 3105.17 of the Revised Code;

* * *

(vii) Any gift of real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.

{¶10} Generally, "'the party seeking to establish an asset as separate property * * * has the burden of proof, by a preponderance of the evidence, to trace the asset to separate property.'" *Strasburg v. Strasburg*, 3d Dist. Auglaize No. 2-10-12, 2010-Ohio-3672, ¶ 20, quoting *Earnest v. Earnest*, 11th Dist. Portage No. 2002-P-0010, 2003-Ohio-704, ¶ 38. "A 'preponderance of the evidence means the greater weight of the evidence that is necessary to destroy the equilibrium.'" *Golan-Elliott v. Elliott*, 3d Dist. Union No. 14-17-01, 2017-Ohio-8524, ¶ 53, quoting *Reed v.*

*Reed*, 3d Dist. Allen No. 1-09-63, 2010-Ohio-4550, ¶ 10. In general, "the holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital property or separate property." R.C. 3105.171(H).

{¶11} In her first assignment of error, Shannon argues that a portion of Joseph's shares of stock in Ohigro is marital property. Shannon contends that the shares of stock were received in consideration for Joseph's employment at Ohigro and thus constitute marital property.

{¶12} With respect to the shares of stock in Ohigro, the trial court found as follows:

All property acquired by the parties during the term of the marriage is marital property subject to equitable division by the Court with the exception of the shares of stock in Ohigro held by Plaintiff subject to the Buy/Sell Agreement dated November 29, 2013, and the prior agreement containing the same restrictive covenants for same. Plaintiff's Three thousand two hundred sixty-seven (3,267) shares of Class B non-voting stock in Ohigro were obtained pursuant to a defined pattern of gifting to transfer ownership of a "closely-held" family business to family members only. All of Plaintiff's stock shares were acquired by him in this fashion, and therefore are separate

property not subject to distribution by this Court. IT IS SO ORDERED.

(Doc. No. 92).

{¶13} In 1965, Joseph's grandfather, James H. Ward ("James"), founded Ohigro, an agricultural services and products company. (Mar. 14-15, 2019 Tr. at 15, 45-46, 236). Joseph began working at Ohigro in January 2001. (*Id.* at 237, 288). At the time of the final divorce hearing, Joseph held the position of Vice President of Operations. (*Id.* at 59-60, 237). Joseph's brother, Jeffrey Ward ("Jeffrey"), is the Controller of Ohigro and primarily oversees the company's finances and human resources. (*Id.* at 26-27). Joseph and Jeffrey's father, Jerry A. Ward ("Jerry"), despite being partially retired, holds the title of President of the company and oversees the business. (*Id.* at 28, 59-60). (*See* Defendant's Ex. V).

{¶14} As an employee of Ohigro, Joseph receives a base salary. (Mar. 14-15, 2019 Tr. at 39-42, 97-98). (*See* Plaintiff's Ex. 1). Additionally, Joseph receives an annual bonus. (Mar. 14-15, 2019 Tr. at 36-37); (Plaintiff's Ex. 1). Although the annual bonus is not guaranteed, Joseph has received an annual bonus most years, and Joseph received an annual bonus in 2016, 2017, and 2018. (Mar. 14-15, 2019 Tr. at 36-37); (Plaintiff's Ex. 1). Ohigro's annual bonuses are determined by the company's profitability for the fiscal year and the employee's seniority and job performance. (Mar. 14-15, 2019 Tr. at 41-42). Additionally, Joseph is a fully-

vested participant in Ohigro's savings and retirement profit sharing plan. (*Id.* at 53, 94); (Plaintiff's Exs. 2, 11). The profit sharing plan is completely company funded, and employees are not able to allocate other amounts from their checks. (Mar. 14-15, 2019 Tr. at 54-55). Joseph is also enrolled in Ohigro's 401k plan, and the company matches a percentage of Joseph's contribution to the plan. (*Id.* at 91-94); (Plaintiff's Ex. 10).

{¶15} Beginning in the late 1990s, James asked Jeffrey to assist him in facilitating the transfer of stock in Ohigro as gifts to his family members. (Mar. 14-15, 2019 Tr. at 22). James's intention in making the gifts was to allow James to witness his children and grandchildren enjoy the gift or "inheritance" while he was alive. (*Id.*). James and Jeffrey enlisted legal counsel to assist in making these gifts and to manage the tax implications. (*Id.* at 27-28). At the advice of counsel, James made his gifts of stock to his family members over a number of years, with the goal of not exceeding the statutory gifting limits and triggering gift tax implications for the recipients. (*Id.*).

{¶16} As of December 31, 1998, Joseph owned 364 shares of Class B nonvoting stock in Ohigro. (Plaintiff's Ex. 3). Joseph's 364 shares constituted 0.552% of the total shares in Ohigro. (*Id.*); (Mar. 14-15, 2019 Tr. at 235). On January 1, 1999, James made the first transfer of stock to his family members, including Joseph and his siblings under the gifting scheme. (Plaintiff's Ex. 3); (Mar.

14-15, 2019 Tr. at 22). On that date, James transferred 464 shares of Class B nonvoting stock in Ohigro each to Joseph, Jeffrey, and Joseph's sister, Julie A. Ward ("Julie"). (Plaintiff's Ex. 3). As of January 1, 1999, Joseph's stock in Ohigro constituted a 1.255% ownership interest in the company. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 22). On March 1, 1999, following a corporate buyout of James W. Ward, Jr., Joseph's ownership interest in Ohigro increased to 1.775% of the company. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 23).

{¶17} On January 1, 2000, James transferred an additional 268 shares of stock in Ohigro to each of Joseph and his siblings. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 23). As of January 1, 2000, Joseph's total shares of Class B nonvoting stock in Ohigro numbered 1,096 and constituted a 2.350% interest in Ohigro. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 23). On May 1, 2001, Joseph's interest in the company increased to 3.712% due to a corporate buyout of the shares of Class B nonvoting stock of Joseph's uncle, Michael J. Ward ("Michael"). (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 18, 78-79). However, Joseph did not receive additional shares of stock in Ohigro on that date. (Plaintiff's Ex. 3).

{¶18} On January 1, 2002, James transferred 71 shares of Class B nonvoting stock in Ohigro to Joseph, bringing Joseph's total number of shares of Class B nonvoting stock to 1,167 and constituting a 3.952% interest in the company. (*Id.*); (Mar. 14-15, 2019 Tr. at 24, 308-309). Following the January 1, 2002 transfer,

James no longer owned any shares of stock in Ohigro. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 24).

{¶19} Following James's final transfer of stock, no shares of stock in Ohigro changed hands for more than ten years. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 24). In 2012, Jerry and Jacqueline K. Ward ("Jacqueline"), Joseph's mother, began the process of transferring their shares of stock in Ohigro to their three children: Joseph, Jeffrey, and Julie. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 18-19, 24-25). Accordingly, on December 1, 2012, Jerry and Jacqueline transferred 2,100 shares of Class B nonvoting stock to Joseph, 2,100 shares to Jeffrey, and 1,100 shares to Julie. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 25, 75, 80-81, 309). As a result of the gifting, Joseph's aggregate number of shares of Class B nonvoting stock in Ohigro was 3,267 shares, constituting an 11.065% interest in the company. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 24, 236). No additional transfers of stock in Ohigro were made between December 1, 2012 and the time of the final divorce hearing. (Mar. 14-15, 2019 Tr. at 62, 136-137); (Plaintiff's Ex. 3).

{¶20} With respect to the discrepancy in the number of shares of stock that Joseph and Jeffrey received, versus the number of shares of stock that Julie received, on December 1, 2012, Jeffrey testified that it was his belief that he and Joseph received more shares of stock in Ohigro than Julie received because they are involved with the company, and Julie does not have the same day-to-day

involvement in the company. (Mar. 14-15, 2019 Tr. at 81-82). As a result of Joseph and Jeffrey's day-to-day involvement in the company, their parents reasoned that the shares of stock in Ohigro would be more meaningful to them than they would be to Julie. (*Id.*). Jeffrey recalled that because of this, Jerry and Jacqueline gifted Julie other assets that totaled the same value and would hold more personal meaning to her. (*Id.*).

{¶21} As of December 1, 2012, five individuals held shares of stock in Ohigro—Jerry, Jacqueline, Jeffrey, Joseph, and Julie. (*Id.* at 16); (Plaintiff's Ex. 3). As of that date, Jerry owned all 980 shares of Class A voting stock and an additional 9,205 shares of Class B nonvoting stock. (Plaintiff's Ex. 3); (Mar. 14-15, 2019 Tr. at 72). Jerry's total shares of stock in Ohigro constituted an ownership interest of 34.495%. (Plaintiff's Ex. 3). Jacqueline's interest in the company totaled 9,350 shares of Class B nonvoting stock for a total ownership interest of 31.667%. (*Id.*). Jeffrey owned a total of 4,457 shares of Class B nonvoting stock, which represented a 15.095% interest in Ohigro. (*Id.*). Joseph owned a total of 3,267 shares of Class B nonvoting stock for a total interest of 11.065%. (*Id.*). Finally, Julie owned a total of 2,267 shares of Class B nonvoting stock for a total ownership interest of 7.678%. (*Id.*).

{¶22} Joseph and Jeffrey testified that at no point was money exchanged in consideration for the shares of stock. (Mar. 14-15, 2019 Tr. at 21, 28, 234). Joseph

and Jeffrey stated that they both understood that they received the shares of stock as part of a gifting or advanced inheritance process from their parents and grandparents. (*Id.* at 23, 28, 234, 265, 309). Moreover, Jeffrey testified that at no time has Ohigro stock been earned by shareholders. (*Id.* at 63). Jeffrey further stated that it has never been the procedure of Ohigro that individuals receive shares of stock in Ohigro for job performance or upon completion of a corporate goal. (*Id.*).

{¶23} The transfer of stock in Ohigro is governed by a Buy-Sell Agreement, which each of the shareholders signed. (*Id.* at 29, 65). (*See* Plaintiff's Ex. 4). The current version of the agreement was executed on November 29, 2013. (Plaintiff's Ex. 4). However, there was a prior version of the Buy-Sell Agreement which was executed in 1998. (Mar. 14-15, 2019 Tr. at 64-65). Joseph provided the 2013 version of the Buy-Sell Agreement as part of the record; however, the 1998 version of the Buy-Sell Agreement is not part of the record. (*Id.* at 65). (*See* Plaintiff's Ex. 4). However, Jeffrey testified that the content of the 1998 version of the agreement is identical to that of the 2013 version. (Mar. 14-15, 2019 Tr. at 65). (*See* Plaintiff's Ex. 4). According to Jeffrey, who worked with counsel to produce the documents, the only difference between the two versions of the Buy-Sell Agreement is the name and signature of the current shareholders, which was updated in 2013 to reflect the

names and signatures of the current shareholders. (Mar. 14-15, 2019 Tr. at 65). (*See* Plaintiff's Ex. 4).

{¶24} Joseph and Jeffrey described Ohigro as a "closely held company." (Mar. 14-15, 2019 Tr. at 103, 130, 140, 237). Jeffrey testified that the Buy-Sell Agreement was created out of the desire to ensure that the shares of stock stay within the immediate family. (*Id.* at 29). The Buy-Sell Agreement was therefore created to ensure that a shareholder that was in need of money or that was the subject of legal proceedings could not sell their stock in Ohigro to individuals outside of the immediate family. (*Id.* at 29-30). Jeffrey testified that he reviewed the 2013 Buy-Sell Agreement with each of the shareholders and that he considered his review of the Buy-Sell Agreement with each of the shareholders as a vehicle to educate the shareholders on the company's guidelines for the transfer of shares of stock in Ohigro. (*Id.* at 65).

{¶25} The Buy-Sell Agreement provides that the shareholder agrees "that he or she will not, during his or her lifetime, give, sell, transfer, trade, pledge or otherwise encumber, or permit to be encumbered by liens, or the legal or equitable interest of another" his or her shares of stock in Ohigro, except as in accordance with the provisions of the agreement. (Plaintiff's Ex. 4). The Buy-Sell Agreement details the process by which the shareholders can dispose of their shares of stock in Ohigro during their lifetime or at death. (*Id.*). The Buy-Sell Agreement mandates

that a living shareholder must first make a written offer of sale to the Board of Directors of Ohigro offering to sell his or her shares to the company. (*Id.*). The Buy-Sell Agreement provides that if the Board of Directors rejects the offer, the shareholder may offer the shares for purchase to the remaining shareholders by a process outlined in the agreement. (*Id.*).

{¶26} Additionally, the Buy-Sell Agreement provides that Ohigro shall have a valuation of the common stock of the company completed every five years by a Certified Public Accounting firm which has expertise in providing independent business valuations including "valuation of stock of closely held businesses." (*Id.*). At the time of the final hearing, the last valuation of Ohigro stock was performed on June 30, 2012. (*Id.* at 69-70). (*See* Defendant's Ex. R). Jeffrey testified that, at the advice of the accounting firm, Ohigro did not perform a valuation of stock five years after the 2012 valuation of stock because there were no plans for the stock to change hands, whether by gifting or otherwise. (Mar. 14-15, 2019 Tr. at 70-74).

{¶27} The Buy-Sell Agreement also states that "[t]he parties agree that the rights protected by this agreement cannot be quantified and reduced to money damages. The corporation and the shareholders each agree that, in any action against any of them to enforce any provision of this agreement, there is no adequate remedy at law and neither they nor any agent will raise to attempt to raise that defense." (Plaintiff's Ex. 4). Although the Buy-Sell Agreement does not

specifically mention the word "divorce," Jeffrey and Joseph both testified that it was their understanding that divorce is included in the provision that one cannot "give, sell, transfer, trade, pledge, or otherwise encumber" shares of stock in Ohigro. (Mar. 14-15, 2019 Tr. at 67-68, 310). (*See* Plaintiff's Ex. 4).

{¶28} The Buy-Sell Agreement references a shareholder ledger attached to the Buy-Sell Agreement as "Schedule A." (Plaintiff's Ex. 4); (Mar. 14-15, 2019 Tr. at 66). However, the copy of the Buy-Sell Agreement presented at the final hearing and included in the record does not have any attachments, including a document labeled "Schedule A." (Mar. 14-15, 2019 Tr. at 66). (*See* Plaintiff's Ex. 4). However, Jeffrey testified that the document referenced as "Schedule A" is the Shareholder Ledger which contains the same information as Plaintiff's Exhibit 3. (Mar. 14-15, 2019 Tr. at 66). (*See* Plaintiff's Ex. 3). Additionally, although the Buy-Sell Agreement references physical certificates of stock, Jeffrey testified that the company has not had physical certificates of stock for many years. (Mar. 14-15, 2019 Tr. at 102-103). Rather, due to the restrictive nature of the Buy-Sell Agreement and the relative rarity of the transfer of shares of stock in Ohigro, the stock ownership is tracked through the shareholder ledger. (Mar. 14-15, 2019 Tr. at 73). (*See* Plaintiff's Ex. 3).

{¶29} After reviewing the record, we conclude that competent, credible evidence supports the trial court's determination that all of Joseph's shares of stock

in Ohigro are separate property. First, Joseph directly testified that he understood that he received his shares of stock in Ohigro as part of a pattern of gifting from his grandparents and parents that was intended to function as an advanced inheritance. Jeffrey, who worked directly with his father, grandfather, and legal counsel in the execution of the gifting, and who received shares of stock in this manner himself, testified to the gifting process and the considerations his parents and grandparents undertook with respect to the gifting. For instance, Jeffrey testified that his grandparents gifted their children and grandchildren shares of stock over the course of several years to avoid gift tax implications. Additionally, no money was exchanged in consideration for Joseph's shares of stock in Ohigro.

{¶30} Although Joseph is an employee at Ohigro, he receives compensation for his employment through his salary, annual bonus, corporate profit sharing plan, and his 401k contribution match, which the trial court determined was marital property. Additionally, Jeffrey testified that employees cannot earn shares of stock in Ohigro through job performance, such as meeting personal or corporate goals.

{¶31} Moreover, the evidence at the final hearing showed that a number of Ohigro employees are not immediate family members and that, at the time of the final hearing, only Joseph, his two siblings, and his parents owned shares of stock in Ohigro. This provides additional evidence that Ohigro is a closely-held

corporation and that Joseph's shares of stock in Ohigro were not acquired in consideration for Joseph's employment at Ohigro.

**{¶32}** Additionally, Ohigro's Buy-Sell Agreement provides additional evidence that Joseph's shares of stock in Ohigro are separate property. The Buy-Sell Agreement details the process by which the shares of stock in the closely-held corporation can be sold by a living shareholder, and provides that the shareholder must offer his or her shares of stock to the corporation and to the remaining shareholders, thus ensuring that the shares of Ohigro remain in the hands of the current shareholders.

**{¶33}** Shannon contends that provisions of the Buy-Sell Agreement are not binding on Joseph's shares of stock because all of Joseph's shares of stock in Ohigro predate the November 29, 2013 Buy-Sell Agreement. However, Jeffrey testified that the current version of the Buy-Sell Agreement was predated by a previous version of the agreement that contained identical content to the current version of the agreement. According to Jeffrey's testimony, the only difference between the two documents were the names and signatures of the current shareholders. Shannon also argues that Joseph's stock was not subject to the restrictive terms in the Buy-Sell Agreement because Joseph did not produce stock certificates containing the restrictions on transfer. However, as Jeffrey testified, Ohigro has not utilized physical stock certificates for many years. Rather, due to the restrictive nature of

the Buy-Sell Agreement and at the advice of counsel, Ohigro has maintained a shareholder ledger to track the ownership of the shares of stock rather than issuing physical certificates of stock. Thus, the fact that the restrictions referenced in the Buy-Sell Agreement were not present on physical certificates of shares of stock does not mean that Joseph's shares of stock in Ohigro were not subject to the transfer restrictions referenced in the Buy-Sell Agreement.

{¶34} Shannon further argues that the Buy-Sell Agreement is defective because the copy of the Buy-Sell Agreement presented at the final hearing does not have Schedule A attached thereto, as referenced in the Buy-Sell Agreement. However, although Schedule A was not physically attached to the copy of the Buy-Sell Agreement presented to the trial court, Jeffrey testified that Schedule A referred to the shareholder ledger. Jeffrey stated that the shareholder ledger is attached to the original version of the Buy-Sell Agreement. Further, a copy of the shareholder ledger, containing the same figures contained in Schedule A was admitted into evidence as Plaintiff's Exhibit 3. Thus, the information contained in Schedule A is part of the record. Moreover, Joseph's failure to physically attach Schedule A to the copy of the Buy-Sell Agreement admitted as evidence at the final hearing does not render the Buy-Sell Agreement invalid. *See generally McCamon-Hunt Ins. Agency, Inc. v. Med. Mut. of Ohio*, 7th Dist. Mahoning No. 02 CA 23, 2003-Ohio-1221, ¶ 9, 11-12. We are also not persuaded by Shannon's arguments that the Buy-

Sell Agreement is defective because the document does not specifically reference "divorce" and does not contemplate unrelated events, such as possible bankruptcy proceedings of a shareholder. Moreover, we are not persuaded by Shannon's argument that the Buy-Sell Agreement is invalid because the company's last valuation of stock occurred more than five years ago. Accordingly, the trial court did not err by determining that Joseph's shares of stock in Ohigro, which are subject to the Buy-Sell Agreement, are separate property.

{¶35} Shannon also argues that Joseph's increased interest in Ohigro following the corporate buyout of Michael's shares of stock in 2001 was marital property because the increase was not the result of a pattern of gifting. Specifically, Shannon contends that Joseph's increased relative interest in the company on May 1, 2001 was not received in accordance with a pattern of gifting. We disagree. On January 1, 2001, Joseph owned 1,096 shares of stock in Ohigro, which constituted a 2.350% interest in the company. However, on May 1, 2001, Joseph's 1,096 shares of stock in Ohigro constituted a 3.712% interest in the company. This increase in Joseph's ownership interest in Ohigro was not due to an increase in the number of Joseph's shares of stock but rather was the result of a decrease in the total number of shares of stock in Ohigro due to a corporate buyout of Michael's shares of stock. Thus, although Joseph's relative ownership interest increased due to a decrease in the total number of shares of corporate stock, Joseph's total number of shares of

stock in Ohigro remained the same. Accordingly, we reject Shannon's argument that the corporate buyout of another shareholder's stock transformed Joseph's existing shares of stock in Ohigro into marital property. To the extent that Shannon argues that any increase in value of Joseph's existing shares of stock in Ohigro is marital property, we will address that argument in our discussion of Shannon's second assignment of error.

{¶36} Finally, Shannon argues that at least a portion of Joseph's shares of stock in Ohigro is marital property because that portion was obtained in consideration for his employment at Ohigro. Specifically, Shannon points to the fact that on December 1, 2012, Joseph and Jeffrey each received 2,100 shares of stock in Ohigro. In contrast, their sister, Julie, who is not involved in the day-to-day operations of the company, received only 1,100 shares of stock. Shannon argues that the discrepancy in the number of shares in the stock received by Joseph, Jeffrey, and Julie indicates that the 1,000 additional shares of stock in Ohigro were given to Joseph and Jeffrey as consideration for their employment at Ohigro. Thus, Shannon reasons, at least 1,000 of the 2,100 shares of stock that Joseph received on December 1, 2012 are marital property. We disagree.

{¶37} First, Jerry and Jacqueline had the right to give away their shares of stock in Ohigro to their children in whatever proportions they so choose. They were not required to gift their shares of stock in Ohigro to their children in equal shares.

Moreover, Shannon's argument that Joseph's additional shares of stock in Ohigro were given in consideration for his employment at Ohigro is undermined by Jeffrey's testimony that Julie received other assets in an amount equal to the additional 1,000 shares of stock in Ohigro that Jacqueline and Jerry gifted their sons. Further, as discussed above, Joseph was compensated for his employment at Ohigro with his base salary, annual bonus, 401k contribution matching, and the corporate profit-sharing program. Moreover, Jeffrey testified that shares of stock in Ohigro were not and could not be earned through job performance. Accordingly, the trial court did not err in determining that Joseph's shares of Ohigro stock were obtained pursuant to a defined pattern of gifting.

{¶38} Thus, for the foregoing reasons, we conclude that the trial court's findings that Joseph's shares of stock in Ohigro are separate property was supported by competent, credible evidence.

{¶39} Accordingly, Shannon's first assignment of error is overruled.

{¶40} In her second assignment of error, Shannon argues that even if the trial court did not err by classifying Joseph's shares of stock in Ohigro as separate property, the trial court abused its discretion by not equitably dividing the appreciation of said shares of stock. Shannon contends that any appreciation of the shares of stock was due to Joseph's labor and was, therefore, a marital asset.

{¶41} However, here, the record indicates that neither party raised the issue below or presented evidence as to the value of any appreciation of Joseph's shares of stock in Ohigro. Although at the final hearing, the parties testified and presented evidence as to the classification of the shares of stock in Ohigro as either separate or marital property, the parties did not specifically raise the issue of the appreciation of the shares of stock in Ohigro. Additionally, a detailed valuation of Ohigro and Joseph's interest therein did not address the issue of the appreciation of Joseph's shares of stock in Ohigro. (*See* Defendant's Ex. V). In addition to not raising the issue at the final hearing, the parties also did not raise the issue in their pretrial briefs. In fact, Shannon did not even file a pretrial brief with the trial court despite the trial court's request that both parties submit pretrial briefs seven days prior to the commencement of the final hearing. (Mar. 14-15, 2019 Tr. at 14-15).

{¶42} Thus, because the parties failed to raise the issue of the appreciation of Joseph's shares of stock in Ohigro below, the issue is waived for purposes of appeal. *See Lassiter v. Lassiter*, 1st Dist. Hamilton No. C-010309, 2002-Ohio-3136, ¶ 26; *Dolan v. Dolan*, 11th Dist. Trumbull Nos. 2000-T-0154 and 2001-T-0003, 2002-Ohio-2440, ¶ 6-7.

{¶43} Accordingly, Shannon's second assignment of error is overruled.

{¶44} In her third assignment of error, Shannon argues that the trial court abused its discretion by awarding her the 2016 Honda Odyssey van. Specifically,

Shannon argues that by awarding the van to her, the trial court did not equitably divide the assets or debts of the marriage. Shannon reasons that, because Joseph's income was greater than hers, the trial court should have awarded the van, and its associated debt, to Joseph. Shannon argues that, in the alternative, the trial court should have ordered the van sold and any profit or loss divided equitably between the parties.

{¶45} Generally, trial courts should divide marital assets and debts equally between the spouses. R.C. 3105.171(C)(1). However, where equal division of the marital assets and debts would be inequitable, "the trial court must 'divide the marital * * * property equitably between the spouses * * *.'" *Siferd v. Siferd*, 3d Dist. Hancock No. 5-17-04, 2017-Ohio-8624, ¶ 25, quoting R.C. 3105.171(B). "Trial courts generally have broad discretion in determining the equitable distribution of property in divorce cases; and therefore, we review the overall appropriateness of the trial court's property distribution under an[] abuse of discretion standard." *Dindal v. Dindal*, 3d Dist. Hancock No. 5-09-06, 2009-Ohio-3528, ¶ 6, citing *Martin v. Martin*, 3d Dist. Marion No. 9-03-47, 2004-Ohio-807, ¶ 6, citing *Lust v. Lust*, 3d Dist. Wyandot No. 16-02-04, 2002-Ohio-3629, *Bisker v. Bisker*, 69 Ohio St.3d 608 (1994), and *Martin v. Martin*, 18 Ohio St.3d 292 (1985). *See also Welsh-Pojman v. Pojman*, 3d Dist. Crawford No. 3-03-12, 2003-Ohio-

6708, ¶ 25 ("We are aware that rigid rules to determine value cannot be established, as equity depends on the totality of the circumstances.").

**{¶46}** "'Although Ohio's divorce statutes do not specifically articulate debt as an element of marital and separate property, the rules concerning marital assets are usually applied to marital and separate debt as well.'" *Siferd,* at ¶ 26, quoting *Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 20, citing *Vonderhaar-Ketron v. Ketron*, 5th Dist. Fairfield No. 10 CA 22, 2010-Ohio-6593, ¶ 34. "'The property to be divided in a divorce proceeding includes not only the assets owned by the parties but also any debts incurred by the parties.'" *Id.*, quoting *Forman v. Forman*, 3d Dist. Marion No. 9-13-67, 2014-Ohio-3545, ¶ 31, citing *Marrero v. Marrero*, 9th Dist. Lorain No. 02CA008057, 2002-Ohio-4862, ¶ 43. Like property acquired during a marriage, debts incurred during a marriage are presumptively marital debts unless it can be proved that they are not. *Schwarck* at ¶ 21, citing *Vergitz v. Vergitz*, 7th Dist. Jefferson No. 05 JE 52, 2007-Ohio-1395, ¶ 12, citing *Knox v. Knox*, 7th Dist. Jefferson No. 04 JE 24, 2006-Ohio-1154, ¶ 25-26.

**{¶47}** Shannon asks this Court to review the trial court's award of the 2016 Honda Odyssey van to her without reference to the overall division of marital property. However, ""[i]n determining whether the trial court abused its discretion, a reviewing court should not examine the valuation and division of a particular

marital asset or liability in isolation.""" *Siferd v. Siferd*, 3d Dist. Hancock No. 5-18-05, 2018-Ohio-3616, ¶ 14, quoting *Siferd*, 2017-Ohio-8624, at ¶ 27, quoting *Harris v. Harris*, 6th Dist. Lucas No. L-02-1369, 2004-Ohio-683, ¶ 19, citing *Briganti v. Briganti*, 9 Ohio St.3d 220, 222 (1984). Rather, """[t]he reviewing court must, instead, view the property division under the totality of the circumstances to determine whether the property division reflects an unreasonable, arbitrary or unconscionable attitude on the part of the domestic relations court.""" *Id.*, quoting *Siferd*, 2017-Ohio-8624, at ¶ 27, quoting *Harris* at ¶ 19, citing *Briganti* at 222.

{¶48} With respect to the parties' vehicles, the trial court made the following orders:

Defendant shall retain the 2016 Honda Odyssey Van currently titled in Plaintiff's name and be responsible for the indebtedness of same and Plaintiff shall be held harmless from payment of same. Plaintiff shall transfer the title to Defendant by May 1, 2019. Plaintiff shall retain the 2016 Honda Civic and the 2016 Chevrolet Corvette, both titled in his name, and be responsible for any indebtedness on same and hold Defendant harmless from any payment for said indebtedness. The parties testified and submitted evidence as to the value of said vehicles and agreed there was no equity in the 2016 Honda Odyssey or the 2016 Chevrolet Corvette. There is approximately Six thousand

dollars ($6,000.00) in equity in the 2016 Honda Civic, which is used
by [the parties' oldest child], and Defendant is hereby credited Three
thousand dollars ($3,000.00) for her equity in same. Plaintiff shall
also retain the John Deere mower valued at Two thousand dollars
($2,000.00), and the zero turn mower, valued at Three thousand
dollars ($3,000.00), along with the Go-cart valued at Two hundred
dollars ($200.00), all of which he requested to keep. The golf cart,
which "hardly runs" and two (2) four-wheelers, kids 50 cc and Honda,
were not assigned a value so they will be sold with the household
goods and other personal property at auction, which can be purchased
by either party, if they wish, and the proceeds divided equally between
the parties. Defendant's total equity in the items specified herein, in
the sum of Five thousand six hundred dollars ($5,600.00) shall be paid
by Plaintiff by June 1, 2019, or shall be deducted from his share of the
equity in the marital residence proceeds. IT IS SO ORDERED.

(Doc. No. 92).

{¶49} At the time of the final hearing, the parties owned many vehicles and
equipment that were acquired during the course of the marriage. (Mar. 14-15, 2019
Tr. at 191-193, 217-224). Shannon primarily drove a 2016 Honda Odyssey van that
was registered in Joseph's name. (*Id.* at 193, 220). The parties purchased the

vehicle new and financed it, and at the time of the final hearing, several years remained on the term of the loan. (*Id.* at 193, 220-221, 374). The Kelley Bluebook trade-in value of the van is $15,663 to $17,238. (*Id.* at 221); (Plaintiff's Ex. 15). The parties owed approximately $25,000 to $30,000 on the vehicle. (Mar. 14-15, 2019 Tr. at 221). Thus, the vehicle "is considerably under water." (*Id.*). At the time of the final hearing, Joseph was maintaining payments on the van. (*Id.* at 252). Shannon testified that the monthly payments for the van are approximately $760 a month and that she could not afford to keep the vehicle. (*Id.* at 193, 374). However, when asked what she recommended that the trial court do with the vehicle, she stated that she was going to "leave that up to the Court to decide," but that she could not afford the monthly payments. (*Id.* at 374).

{¶50} The parties also owned a 2016 Chevy Corvette. (*Id.* at 191, 217). Joseph primarily drove the vehicle, and the vehicle was registered in his name. (*Id.* at 191, 217, 374-375). The parties financed the vehicle on an eight-year loan. (*Id.* at 217). At the time of the hearing, the loan on the 2016 Chevy Corvette had not yet been paid off. (*Id.*). Joseph testified that he agreed with the Kelley Blue Book trade-in value of the Corvette, which was listed at between $37,318 and $40,699. (*Id.* at 218); (Plaintiff's Ex. 13). Joseph testified that due to the eight-year term of the loan, there was no equity in the vehicle. (Mar. 14-15, 2019 Tr. at 218-219). At the hearing, Joseph, who was maintaining payments on the 2016 Chevy Corvette,

requested that the trial court award him the vehicle. (*Id.* at 218, 252). Shannon agreed that Joseph should retain the vehicle. (*Id.* at 375).

{¶51} The parties' third vehicle was a 2016 Honda Civic, which is registered in Joseph's name, but was primarily driven by the parties' oldest child. (*Id.* at 161, 191, 219). The parties purchased the 2016 Honda Civic new and financed the vehicle. (*Id.* at 219). At the time of the hearing, Joseph was maintaining payments on the vehicle. (*Id.* at 252). The parties owed approximately $6,500 on the vehicle and the trade-in value of the vehicle was approximately $12,398 to $13,581. (*Id.* at 219-220); (Plaintiff's Ex. 14). Both of the parties expressed a desire for their oldest child to continue driving the vehicle. (Mar. 14-15, 2019 Tr. at 220, 374). Joseph requested that the trial court order Shannon to pay for half of the Honda Civic payments. (*Id.* at 220). However, Shannon testified that due to uncertainty regarding her financial situation, she was unable to commit to making a financial contribution toward the vehicle. (*Id.* at 374).

{¶52} The parties also owned a 2010 John Deere lawn mower, which Joseph requested that the trial court award to him. (*Id.* at 191-192, 222). Joseph estimated that the John Deere lawn mower was worth approximately $1,500 to $2,000. (*Id.* at 222). In addition, the parties owned a zero-turn lawn mower, which Joseph requested that the trial court award to him. (*Id.* at 222-223). Joseph estimated that the zero-turn lawn mower is worth approximately $3,000. (*Id.* at 222). During the

course of the marriage, the parties also purchased a go-cart, which Joseph estimated was worth several hundred dollars. (*Id.* at 192, 223). Joseph requested that he retain the go-cart for the parties' children. (*Id.* at 223-224). In addition, the parties owned a golf cart and two four-wheeler vehicles. (*Id.* at 222-223).

{¶53} Reviewing the totality of the facts and circumstances in the record, we cannot conclude that the trial court abused its discretion by awarding the 2016 Honda Odyssey van, with its associated debt, to Shannon. As this court has held, "[t]he mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion." *Kimmey v. Kimmey*, 3d Dist. Allen No. 1-01-68, 2001 WL 1338847, *6 (Oct. 31, 2001). Here, the parties owned two vehicles that did not contain equity, the 2016 Honda Odyssey van and the 2016 Chevy Corvette, and the trial court awarded each of the parties one of the vehicles. At the final hearing, the parties did not supply the trial court with exact figures for the balance remaining on the loans associated with the 2016 Honda Odyssey van or the 2016 Chevy Corvette, but instead provided the trial court with broad estimations of the same. Additionally, the trial court equally divided the equity associated with the remaining vehicles and equipment.

{¶54} Furthermore, the division of the equity and debt associated with the parties' vehicles was part of a larger property settlement. Aside from the classification of Joseph's shares of stock in Ohigro as separate property, which we

addressed above, and the award of the 2016 Honda Odyssey van, Shannon does not argue that the trial court's division of property, which includes the parties' retirement accounts, Ohigro profit sharing, and real estate, is inequitable.

{¶55} Shannon reasons that the trial court abused its discretion by awarding her the Honda Odyssey van because, at the time of the final hearing, her wages were lower than Joseph's wages. However, the trial court addressed the disparity in its findings related to spousal support. The trial court acknowledged that "there exists a significant disparity in incomes of the parties" and that Shannon's income was significantly diminished by the parties' agreement that she would stay home with the parties' children. (Doc. No. 92). The trial court also considered Shannon's earning potential at the time of the final hearing and in the future. (*Id.*). The trial court then ordered Joseph to pay Shannon $2,000 per month in spousal support effective April 1, 2019 to January 1, 2021. (*Id.*). The trial court further ordered that Joseph pay Shannon a monthly spousal support order of $1,500 effective from January 1, 2021 to January 1, 2023. (*Id.*). The trial court ordered that the spousal support award would reduce to $1,000 per month from January 1, 2023, to January 1, 2030, at which time the spousal support award would terminate. (*Id.*). Thus, the trial court did properly consider the disparity in income of the parties and factored the disparity into its overall property distribution.

{¶56} After reviewing the totality of the facts and circumstances in the record, we cannot conclude that the trial court's award of the 2016 Honda Odyssey van and its associated debt to Shannon was so unreasonable, arbitrary, or unconscionable as to constitute an abuse of discretion. *See Kimmey*, 2001 WL 1338847, at *6; *Clark v. Clark*, 7th Dist. Noble No. 03 NO 308, 2004-Ohio-1577, ¶ 30 ("[W]ithout more, a difference of $1,500 in the property division does not constitute a clear abuse of discretion."); *Speck v. Speck*, 6th Dist. Wood No. WD-09-005, 2009-Ohio-6684, ¶ 50-51; *Hancock v. Hancock*, 6th Dist. Williams No. WM-02-011, 2002-Ohio-7106, ¶ 15 (finding that the trial court did not err by awarding appellant "a significantly larger portion of debt").

{¶57} Accordingly, Shannon's third assignment of error is overruled.

{¶58} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**